UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| CECELIA J. PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:14CV47 ACL |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Cecelia J. Patton brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's final decision denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*; and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, it is reversed.

## I.  Procedural History

Plaintiff applied for DIB and SSI on December 30, 3010, claiming disability because of bipolar disorder, anxiety, diabetes, and hypertension.  She alleges a

disability onset date of June 30, 2010. The Social Security Administration initially denied plaintiff's applications on March 18, 2011. After a hearing on August 30, 2012, at which plaintiff and a vocational expert testified, an Administrative Law Judge (ALJ) entered a written decision on September 28, 2012, finding plaintiff not disabled because of her ability to perform her past relevant work as well as other work as it exists in significant numbers in the national economy. On March 22, 2014, after review of additional evidence, the Appeals Council denied plaintiff's request to review the ALJ's adverse decision. The ALJ's decision thus became the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now requests this Court to review the ALJ's decision, arguing that the ALJ erred by failing to accord controlling weight to the opinion of plaintiff's treating psychiatrist, Dr. Clark. Plaintiff further argues that by discounting Dr. Clark's opinion, the record was devoid of opinion evidence, and the ALJ should have ordered a consultative examination in order to fully develop the record. Plaintiff also contends that the ALJ's assessment of her residual functional capacity (RFC) failed to include the effects of her severe mental impairments, arguing that the ALJ erred by relying on her work history and her role as a mother to find her able to perform work-related activities. Plaintiff requests that the final decision be reversed and the matter remanded for an award of benefits or, alternatively, for further proceedings. For the reasons that follow, the matter is

remanded for further proceedings.[1]

## II. Testimonial Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on August 30, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-eight years of age.  (Tr. 34.) Plaintiff is married but has been separated from her spouse for two and a half years.  Plaintiff has four children, ages twenty, eighteen, thirteen, and five.  She lives in her in-laws' house with her five-year-old daughter.  (Tr. 35-36.)  Plaintiff completed high school and went to college for one semester.  (Tr. 37.)

Plaintiff's Work History Report shows plaintiff to have worked as a health aide from the summer of 2008 to June 2010.  (Tr. 212.)  The care facility at which plaintiff last worked was owned by a family member.  Plaintiff was laid off from this job because of missed time from work.  Plaintiff testified that she spent a lot of time in the bathroom during working hours because she was sick.  (Tr. 38.) Plaintiff testified that she also previously worked as a waitress.  (Tr. 39-40.)

Plaintiff testified that she receives treatment for bipolar disorder, anxiety,

---

[1] Plaintiff challenges the ALJ's decision only to the extent it addresses her mental impairments. Plaintiff raises no challenge to the ALJ's treatment of her physical impairments.  While the undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, the recitation of specific evidence in this Memorandum and Order is limited to only that relating to the issues raised by plaintiff on this appeal.

depression, post-traumatic stress disorder (PTSD), and for nighttime and daytime terrors. Plaintiff testified that her depression affects her about three weeks a month at which time she cannot function and stays in bed. Plaintiff testified that she is unable to take care of household chores such as cooking and cleaning, and is unable to attend to her personal hygiene. Plaintiff's in-laws and twenty-year-old daughter shop for her during these periods. (Tr. 41-42.)

Plaintiff testified that her five-year-old daughter is cared for by the child's father, sister, or grandmother three or four days a week because plaintiff is in bed. Plaintiff testified that she calls to have someone pick up her daughter because she wants to make sure she is taken care of. Plaintiff testified that she worries about her child's safety if she is with someone other than her father or grandmother, and she experiences symptoms of anxiety because of such worry. Plaintiff testified that she has difficulty giving her daughter a bath because of memories of her own childhood experiences. Plaintiff takes a thirty-minute "timeout" after her daughter's bath in order to "get [herself] together." (Tr. 43-44.)

Plaintiff testified that she has nightmares at least three times a week for which she takes medication. Plaintiff testified that she wakes up in a sweat and is usually yelling. Plaintiff often becomes sick when she has a nightmare and usually experiences an upset stomach and crying spells the following day. She experiences nausea, pain, and vomiting six days a week and takes medication to soothe her

stomach.  Plaintiff has seen specialists regarding her upset stomach.  (Tr. 45-46.)

Plaintiff testified that she also experiences flashbacks on a daily basis and remembers things that happened to her, which causes her to feel paranoid and that people are out to get her.   During severe episodes, plaintiff goes into the bathroom, turns off the light, and spends time alone crying.  Plaintiff feels as though someone is hurting her.  (Tr. 47.)

With respect to her bipolar disorder, plaintiff testified that she experiences manic episodes about twice a year that last four or five days.  Plaintiff testified that she gets really excited during these episodes, exercises poor judgment, talks in a strange manner, and hears voices.  Plaintiff testified that she usually "crash[es] and burn[s] into depression" after such episodes, at which time she experiences severe depression, stays in bed, and has suicidal thoughts.  (Tr. 46-47.)

Plaintiff takes medications for her conditions, including Prozac, Geodon, Lamictal, Minipress, Ambien, and Promethazine.  Plaintiff testified that she is compliant with her medications.  Plaintiff previously took Seroquel but stopped because of weight gain, eye problems, and its lack of effectiveness.  (Tr. 51, 54.) Plaintiff testified that she was able to successfully work in the past with her mental impairments because her medications were effective at the time.  Plaintiff testified that her depression became more severe after the birth of her daughter, and she was without medication for a year or two afterward.  (Tr. 58-60.)  Plaintiff then sought

treatment with Mark Twain Behavioral Health to restart her medication, but she stopped treatment shortly after starting because of overwhelming depression and her inability to keep up with her appointments.  (Tr. 52, 58-59.)  Plaintiff testified that she thereafter was hospitalized because of increased depression and thoughts of suicide.  At the time of her hospitalization, plaintiff had been without medication for two or three months.  (Tr. 57-58.)  Plaintiff began mental health care with another facility after her hospitalization.  (Tr. 52.)

Plaintiff does not drive.  She rides in cars, but only when necessary because she feels a lot of anxiety when in a car – with feelings of paranoia and tightening in her chest.  Plaintiff also has difficulty being around people.  She becomes anxious and has panic attacks, with tightening in her chest and crying.  She hurries and tries to get away from people and locks herself in a bathroom.  Plaintiff testified to being presently uncomfortable in the hearing room.  (Tr. 49-50.)

Plaintiff testified to previous marijuana use and that she had been charged in the past with marijuana possession.  Plaintiff testified that she had smoked marijuana to help calm her stomach, but was told that such use would lead to other problems.  Plaintiff had not smoked marijuana for the two months prior to the hearing.  (Tr. 54-55.)

B.    <u>Vocational Expert Testimony</u>

Jeffrey F. Magrowski, a vocational expert (VE), testified at the hearing in

response to questions posed by the ALJ and counsel.

The VE classified plaintiff's past work as a caregiver as medium and semi-skilled; as a waitress as light and semi-skilled; and as a cook helper as medium and unskilled. (Tr. 62.)

The ALJ asked the VE to assume an individual of plaintiff's age, education, and work experience and to further assume the person could perform work at any exertional level but could not perform any fast-paced production work or tasks requiring more than superficial contact with the public. The VE testified that such a person could not perform any of plaintiff's past relevant work, but could perform light, unskilled work as a cleaner in housekeeping, of which 2,000 such jobs exist in the State of Missouri and 200,000 nationally; as an apparel stocker or checker, of which 1,000 such jobs exist in the State of Missouri and 100,000 nationally; and as a laundry or garment bagger, of which 1,000 such jobs exist in the State of Missouri and 50,000 nationally. (Tr. 62-63.) The VE testified that the person could perform these same jobs if she were restricted to routine, simple, and repetitive tasks. The VE further testified that a person could perform only part-time work if she was prevented from regularly engaging in sustained work activity for a full eight-hour day. (Tr. 64.)

In response to counsel's questions, the VE testified that a person who was chronically absent from work one or two days a month would likely be terminated

if the absences continued.  The VE also testified that he was unaware of any "regular jobs" for a person who, in addition to normal customary breaks, would be off task greater than fifteen percent of the day.  (Tr. 65-66.)

### III.  Medical Evidence

Upon referral, plaintiff went to Mark Twain Area Counseling Center on August 11, 2008, for evaluation for psychotropic medication.  It was noted that plaintiff had been diagnosed six years prior with PTSD, bipolar disorder, anxiety, and obsessive compulsive disorder and had difficulty remaining on psychotropic medication at that time because of her parents not wanting her to be on medication. Plaintiff was currently taking no psychotropic medication and reported having increased anxiety with worsening mood swings and tearfulness.  Plaintiff reported a history of sexual molestation as a child and sexual assault as a teenager.  Mental status examination showed plaintiff to be anxious, tearful, sad, and depressed. Plaintiff had good eye contact and demonstrated fair insight and judgment. Plaintiff denied any current intent to harm herself or others.  Plaintiff reported having decreased memory and concentration as well as depressed mood.  Plaintiff also reported her mood to fluctuate and that she has had racing and obsessive thoughts.  Plaintiff reported having panic attacks relating to her thoughts of past abuse and being paranoid about the safety of her daughter.  Plaintiff denied any recent use of illicit substances.  Dr. Ronald St. Hill diagnosed plaintiff with bipolar

disorder, and alcohol and cannabis dependence in sustained remission. A Global Assessment of Functioning (GAF) score of 45 was assigned.[2] Dr. St. Hill prescribed Seroquel and Prozac and referred plaintiff for individual counseling. Plaintiff was instructed to return in two to three weeks for medication management. (Tr. 284-86.) On August 25, plaintiff was noted to be more relaxed. Although plaintiff complained of headaches, she was continued on her medications. A GAF score of 52 was assigned.[3] (Tr. 283.)

Plaintiff visited Mark Twain Behavioral Health (Mark Twain) on December 29, 2008, and reported an increase in depressive symptoms and anxiety. Mental status examination showed decreased activity with a depressed affect and slowed thought process. Plaintiff's insight and judgment were noted to be fair. Plaintiff was diagnosed with PTSD, was prescribed Prozac and Trazodone, and was instructed to hold off on Seroquel. A GAF score of 52 was assigned. (Tr. 282.)

Plaintiff returned to Mark Twain on July 13, 2009, and reported that she had

---

[2] According to the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text Rev. 2000) (DSM-TR-IV), the GAF scale is used to report the clinician's judgment of the individual's overall level of functioning and consists of a number between zero and 100 to reflect that judgment. *See Hurd v. Astrue*, 621 F.3d 734, 737 (8th Cir. 2010); *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003). A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). DSM-TR-IV at 34.

[3] A GAF score between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers). DSM-TR-IV at 34.

been out of medication for one week. Plaintiff was noted to be depressed and stressed and to have decreased activity level. Plaintiff reported being forgetful and losing things. Plaintiff was instructed to increase her Prozac and to continue with Trazodone. Plaintiff was instructed to return in three to six months. (Tr. 281.)

On January 27, 2010, plaintiff reported to Mark Twain that she was compliant with her medications but felt sorry for herself because of her emotional issues. Plaintiff was noted to be calm and pleasant, but she was depressed and had decreased motivation. Plaintiff reported having mood swings and seeing shadows. Plaintiff reported drinking at night and that she was quick to get mad. Plaintiff reported that Trazodone caused bad dreams, and she was instructed to discontinue its use. Plaintiff was restarted on Seroquel and continued on Prozac. Plaintiff was instructed to return in four to six weeks. (Tr. 280.)

Plaintiff returned to Mark Twain on March 4, 2010, and reported having nausea and multiple physical issues. Plaintiff was noted to be depressed and anxious, and she felt helpless, hopeless, and worthless. Celexa and Prozac were prescribed, and plaintiff was continued in her GAF score of 52. (Tr. 279.)

The record is silent with respect to mental health treatment for a period of nineteen months, between March 4, 2010 and October 2011, at which time plaintiff visited Mark Twain. During this lengthy period of no documented mental health treatment, the record shows that plaintiff sought and received treatment for

physical complaints such as nausea and vomiting; and plaintiff's health care providers continually noted plaintiff to be taking Prozac and Seroquel. (*See* Tr. 289, 291-92, 348-49.) Also within this period, and specifically on March 18, 2011, Mark Altomari, Ph.D., a psychological consultant with disability determinations, reported in a Psychiatric Review Technique Form that there was insufficient evidence from which to determine the severity of plaintiff's medically determinable mental impairments of bipolar disorder, PTSD, and alcohol and marijuana dependence in sustained remission. Specifically, Dr. Altomari reported that there was insufficient evidence to determine the effect of such impairments on plaintiff's activities of daily living; on her ability to maintain social functioning; and on her ability to maintain concentration, persistence, or pace; or whether her impairments caused repeated episodes of decompensation of extended duration. (Tr. 299-10.)

As noted above, plaintiff returned to Mark Twain in October 2011. She reported being out of her medication – Prozac and Seroquel – for seven days. Plaintiff was noted to be polite and cooperative and to have good eye contact and no eccentricities of speech. Plaintiff reported having occasional nausea and vomiting caused by anxiety. Plaintiff denied any alcohol use and admitted to past marijuana use. Plaintiff reported her previous psychiatric treatment to be "hit or miss." Mental status examination showed plaintiff to be oriented times four.

Plaintiff described her sleep as poor and reported having vivid nightmares. Plaintiff likewise reported her appetite to be poor. Plaintiff reported poor memory, but recall testing showed her memory to be intact. Plaintiff reported having difficulty completing tasks and that she had little energy. Plaintiff denied having any hallucinations. Plaintiff reported having thoughts of suicide but no plan. Plaintiff also reported having fluctuating moods with periods of occasional highs and racing thoughts and episodes of depression. Plaintiff reported not being as happy as she was before, and she wanted to try something different from her current medications. Dr. David E. Goldman diagnosed plaintiff with bipolar disorder and attention deficit hyperactivity disorder (ADHD), as well as stomach upset secondary to stress. Dr. Goldman assigned a GAF score of 45. Plaintiff was provided samples of Saphris and was instructed to return for follow up in three to four weeks. (Tr. 320-22.)

Plaintiff visited Dr. Goldman and Mark Twain counselors on November 2, 2011, who noted plaintiff to be somewhat depressed and tearful. Plaintiff was not doing well and reported not being able to function. Plaintiff reported that she was compliant with her medication and felt a little better with it but that she continued to experience symptoms, including night terrors, night sweats, and nightmares. Plaintiff reported that she also felt hopeless and worthless and would like to just stay in bed. Plaintiff reported sleeping late and going days without bathing.

Plaintiff also reported that worsening anxiety caused her not to want to be around a lot of people. She did not like to leave the house, but was able to shop independently for groceries and other needed items. Plaintiff also reported continued manic symptoms in that she had two- or three-day periods when she cannot sleep; talks excessively and has rapid speech; has racing thoughts, anger, and increased energy; and has problems with concentration. Plaintiff reported being obsessive during these periods, especially with housecleaning. Plaintiff reported occasional suicidal ideations but no intent. Plaintiff admitted to self-medicating with alcohol and marijuana years prior, but reported that she had not used alcohol for ten years and last smoked marijuana three years ago. Plaintiff reported currently receiving unemployment benefits, food stamps, and Medicaid benefits. Plaintiff reported having poor follow through with appointments, but expressed a desire to get her mental health under control, continue with treatment, and participate in therapy. Plaintiff was diagnosed with bipolar disorder, PTSD, ADHD, and alcohol and cannabis dependence in sustained full remission. Plaintiff was assigned a current GAF score of 48, with an opinion that her highest GAF score within the past year was 48. Plaintiff was approved for participation in the Community Psychiatric Rehabilitation (CPR) Program. (Tr. 336-44.) A treatment plan was established for plaintiff to receive counseling and medication management with Dr. Goldman and CPR counselors. Plaintiff's symptoms and

limited resources were noted to be significant obstacles that could prevent achievement of her treatment goals. (Tr. 323-27.)

Attempts to reach plaintiff by telephone on November 8, 16, and 28 to establish an initial visit for mental health services were unsuccessful. (Tr. 332, 333, 334.) Attempts to contact plaintiff in December and January were likewise unsuccessful. (Tr. 329, 330, 331.) Effective January 31, 2012, plaintiff was discharged from Mark Twain for her failure to appear for services. (Tr. 328, 335.)

Plaintiff was admitted to Blessing Hospital on March 26, 2012, with depression and suicidal ideas with plans to overdose.[4] Plaintiff reported having been off of her prescription medication for three months and that her depression had become unbearable. Plaintiff reported being sad, down, and depressed and that she had feelings of hopelessness, helplessness, and worthlessness. Plaintiff reported being very tearful and having irrational feelings of guilt, an inability to focus or concentrate, anhedonia, and no energy. Plaintiff also reported being unable to sleep at night because of bad dreams. Plaintiff reported that she last drank alcohol about ten years prior and that she smoked cannabis to calm herself down. Urine screening was positive for the presence of cannabis. Plaintiff's

---

[4] The records from Blessing Hospital were not before the ALJ at the time of his decision but were submitted to and considered by the Appeals Council in determining whether to review the ALJ's adverse decision. The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

mental history was noted, including her most recent discharge from Mark Twain because of missed appointments. Plaintiff reported that taking Prozac, Seroquel, and Saphris was effective. Plaintiff reported her childhood history of sexual trauma and that she continued to have intrusive thoughts, painful memories, bad dreams, and nightmares about the abuse. Plaintiff reported that raising her daughter reminds her of the trauma. Mental status examination showed plaintiff to be tearful and passively cooperative. Plaintiff was dysphoric and had a depressed mood and affect. Memory, attention, and concentration appeared to be intact. Plaintiff denied any hallucinations or delusions. Plaintiff's insight and judgment were limited. Plaintiff was diagnosed with major depressive disorder, severe, recurrent, without psychotic features; chronic PTSD; cannabis abuse; and alcohol dependence in sustained remission. Upon admission, plaintiff was assigned a GAF score of 30.[5] (Tr. 435-36.)

During her admission at Blessing, plaintiff was given Prozac and Geodon and participated in group therapy. Plaintiff experienced stomach upset possibly related to her medication, but she was able to tolerate the discomfort. Plaintiff became more hopeful and positive during her admission. Plaintiff was discharged on March 30 with a GAF score of 50 and was referred for outpatient counseling at

---

[5] A GAF score between 21 and 30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends). DSM-TR-IV at 34.

Comprehensive Health Systems. Plaintiff's discharge medications included Prozac and Geodon. (Tr. 437-39.)

In April 2012, Comprehensive Health Systems completed an evaluation for intake assessment and treatment plan development. The initial assessment took place at plaintiff's home on April 18, and plaintiff underwent a psychiatric evaluation with Dr. Jason Cafer on April 23. During this assessment, plaintiff reported that she was recently hospitalized at Blessing because she was "ready to end it" and knew she needed help. Plaintiff reported that she had been isolating herself due to anxiety, was sleeping too much, and was unable to complete tasks. Plaintiff reported needing support as she proceeded through the disability process. Plaintiff's current medications were noted to include Geodon and Prozac. Plaintiff's hygiene was poor and her hair was disheveled. Her home was noted to be cluttered and did not appear to be clean. Plaintiff reported that she lacked energy and had no motivation to complete household tasks. Plaintiff was also noted not to be motivated to complete personal care tasks. She struggled with good hygiene because of her depressive symptoms. Plaintiff reported that she cooks only because she needs to feed her five-year-old daughter. As to her social relationships, plaintiff reported that she was close to her mother. Plaintiff reported that her two older children were taken away from her and adopted and that she maintained a relationship with her fourteen-year-old daughter, who lived in Iowa

with her father.  Plaintiff also maintained contact with her current spouse, from whom she was separated.  Plaintiff admitted to limited coping skills.  Plaintiff was oriented times five, cooperative, and maintained good eye contact.  Her intellect was determined to be average and she was able to stay on topic.  No psychotic symptoms were noted, but plaintiff reported having delusions and hallucinations in the past.  Plaintiff denied any suicidal or homicidal thoughts.  She described her mood as okay.  It was noted that plaintiff had been discharged from previous mental health services because of missed appointments, and plaintiff reported that she tried to function without medication but realized that she was unable to do so. It was noted that plaintiff had a history of poor judgment.  Plaintiff reported her current mood symptoms to include sleeping too much, mood changes, crying spells, isolation, memory and concentration problems, decreased self-esteem, excessive guilt, irritability, and feelings of hopelessness, helplessness, and worthlessness.  Plaintiff reported that she was sometimes unable to awaken in the morning and goes days without bathing because she lacks energy.  Plaintiff reported her manic symptoms to include pressured speech, grandiosity, racing thoughts, increased energy, decreased need for sleep, and euphoric mood.  Plaintiff also reported symptoms of anxiety – including fear of panic attacks – and that she has night terrors and problems with intrusive memories from the past.  Plaintiff reported a suicide attempt ten years prior.  Plaintiff reported that medication has

helped but she wanted something that would manage her symptoms more effectively. Plaintiff reported not being troubled by any side effects. Plaintiff reported past use of alcohol and marijuana and that marijuana helped with anxiety and to settle her stomach. Plaintiff denied any current use of marijuana, but it was noted that she tested positive for the substance during her recent hospitalization in March. Plaintiff reported that she had not used the substance since being hospitalized. Plaintiff reported drugs and alcohol not to be a problem but expressed a willingness to attend individual counseling in Integrated Dual Disorder Treatment (IDDT). Dr. Cafer diagnosed plaintiff with bipolar disorder with psychotic features, PTSD, cannabis dependence with physiological dependence, alcohol dependence with physiological dependence in sustained full remission, and panic disorder. Plaintiff was assigned a GAF score of 35.[6] It was noted that plaintiff continued to receive unemployment benefits and food stamps. Dr. Cafer determined plaintiff's mental illness to be chronic and opined that she would need psychiatric services on a long-term basis. A critical intervention plan was established for plaintiff to receive medical, psychiatric, and supportive care, including an assessment for substance abuse counseling. Dr. Cafer determined to

---

[6] A GAF score between 31 and 40 indicates some impairment in reality testing or communication (*e.g.*, some speech is at times illogical, obscure, or irrelevant); or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed person avoid friends, neglects family, and is unable to work). DSM-TR-IV at 34.

increase plaintiff's Prozac, and Minipress was added to plaintiff's medication regimen for nightmares.  (Tr. 359-67, 389-91.)

Plaintiff reported to Dr. Cafer on May 7, 2012, that Minipress was not helping with nightmares and that she was irritable and snapping at everyone. Plaintiff was instructed to increase her dosage of Minipress.  (Tr. 387.)  On May 24, plaintiff reported to Dr. Cafer that she had difficulty with sleep.  Plaintiff reported her racing thoughts to worsen at night.  On a scale of one to ten, plaintiff rated her depression as a three, her anxiety as a seven, her irritability as a six, and her insomnia as a nine.  Plaintiff reported having nightmares less frequently and less severe than before increasing Minipress, but she continued to have them twice a week.  Plaintiff's current medications were noted to be Geodon, Prozac, and Minipress.  Mental status examination showed plaintiff's grooming to be fair.  Her mood was mildly to moderately depressed, and her affect was within normal limits. Plaintiff's mental status examination was normal in all other respects.  Dr. Cafer continued in his diagnoses of plaintiff and assigned a GAF score of 42.  Plaintiff was instructed to further increase her dosage of Minipress for nightmares as well as her dosage of Geodon for mood, anxiety, and irritability.  Ambien was prescribed for insomnia.  Plaintiff was instructed to return in one month at which time she would see Dr. Clark.  (Tr. 385.)

On June 4, Dr. Cafer again instructed plaintiff to increase her dosage of

Minipress in response to plaintiff's complaints of worsening nightmares. (Tr. 383.)

Plaintiff underwent evaluation for substance abuse treatment on June 11, 2012, and reported having used cannabis four times within the past thirty days to ease her stomach pains. Plaintiff reported having no alcohol or drug problems within the past thirty days. It was recommended that plaintiff be admitted to the IDDT program given that she met the criteria for cannabis and alcohol dependence, but plaintiff indicated that she was not presently interested in participating. (Tr. 379-80.)

Plaintiff went to Hannibal Regional Hospital on June 19, 2012, for reasons not stated in the records. Plaintiff left against medical advice prior to receiving treatment because of the delay in being seen. (Tr. 356.)

On July 12, 2012, plaintiff underwent a psychiatric evaluation with Dr. Lyle Clark at Comprehensive Health Systems. Dr. Clark noted plaintiff's current medications to be Geodon, Minipress, Ambien, and Prozac. Plaintiff reported that she felt her medication was working "pretty good," but her symptoms were noted to be only partially controlled. Dr. Clark noted plaintiff's history of mental impairments, and plaintiff reported that she currently experienced problems with being tired, very irritable, and becoming angry with people. Plaintiff also reported having psychotic symptoms for more than one year, including an altered

perception of reality with auditory hallucinations, disorganization of thought, and persecutory delusions. Plaintiff reported having a depressed mood almost every day, anhedonia, increased sleep, loss of energy, inappropriate guilt, problems with thinking and concentration, and thoughts of death. Plaintiff also described experiencing manic episodes that included talkativeness, racing thoughts, distractibility, restlessness, increased socialization, and spending sprees. Plaintiff reported experiencing mood swings several times a week. Plaintiff also reported having symptoms of panic attacks several times a week, with feelings of intense fear or discomfort, palpitations, sweating, shortness of breath, shaking, chest pain, and fear of losing control. Plaintiff also described agoraphobic symptoms and symptoms of social phobia, which were considered by Dr. Clark to be excessive and to interfere with normal functioning. Plaintiff also reported symptoms of compulsions, such as arranging things, repeating words, and performing tasks in a certain order. Plaintiff reported having intrusive thoughts, repeated nightmares, flashbacks, and intense bad feelings about her abuse as a child. Dr. Clark observed plaintiff to have problems consistent with serious impairments in thinking and mood as well as serious impairments due to anxiety. Dr. Clark determined plaintiff to be in sustained full remission with regard to her alcohol and cannabis dependence. Mental status examination showed plaintiff to be oriented times four. Plaintiff's hygiene was adequate. She was cooperative and pleasant, and her

speech was within normal limits.  Plaintiff's intellect was considered to be average, and her memory was noted to be fair.  Plaintiff's thoughts demonstrated logical associations.  Plaintiff reported occasional auditory hallucinations, but no delusions were detected.  Plaintiff reported having depressive ideation but no suicidal ideation.  Dr. Clark noted plaintiff's mood to be depressed and her affect appropriate.  Plaintiff's insight and judgment were adequate.  Dr. Clark determined that plaintiff's symptoms caused significant distress and interference with functioning.  Dr. Clark diagnosed plaintiff with chronic bipolar disorder, severe, with psychotic features and rapid cycling; panic disorder with agoraphobia; social phobia; obsessive compulsive disorder; chronic PTSD; and alcohol and cannabis dependence, without physiologic dependence, in sustained full remission.  Dr. Clark assigned a GAF score of 43.  Lamictal was added to plaintiff's medication regimen, and she was instructed to return in four weeks.  (Tr. 375-78.)

On August 16, 2012, Dr. Clark completed a Mental Medical Source Statement of Ability to Do Work-Related Activities (Mental MSS).  Dr. Clark opined that plaintiff was moderately limited in her ability to make judgments on complex work-related decisions and to understand, remember, and carry out complex instructions, but was only mildly limited with respect to simple work decisions and instructions.  Dr. Clark further opined that plaintiff was markedly limited in her ability to interact appropriately with the public and supervisors, and

moderately limited in her ability to interact appropriately with coworkers and respond appropriately to usual work situations and to changes in a routine work setting. Dr. Clark explained that plaintiff had social phobia and had difficulty in public situations. Dr. Clark reported that plaintiff's dysfunction worsens when she is being closely supervised. Dr. Clark also explained that plaintiff had problems with irritability that made it difficult for her to function in frustrating situations. Dr. Clark reported that, to his knowledge, alcohol or substance abuse did not contribute to any of plaintiff's limitations. (Tr. 393-95.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through March 31, 2014, and had not engaged in substantial gainful activity since June 30, 2010, the alleged onset date of disability. The ALJ found plaintiff's bipolar disorder, anxiety disorder, and PTSD to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix. 1. The ALJ found that plaintiff had the RFC to perform a full range of work at all exertional levels, but was limited to jobs requiring no more than superficial interaction with the public and no fast-paced production work. The ALJ found plaintiff's RFC not to preclude the performance of her past relevant work as a kitchen prep worker. Alternatively, the ALJ found

vocational expert testimony to support a finding that, with her age, education, work experience, and RFC, plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, cleaner, stocking work – apparel, and garment bagger. The ALJ thus found plaintiff not to be under a disability from June 30, 2010, through the date of the decision. (Tr. 11-24.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a

five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v.*

*Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted).  "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation

marks and citations omitted).

To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, the Court must review the entire

administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted).  The Court must also consider any evidence

which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The decision may not be reversed merely because substantial evidence could also support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

Plaintiff's challenges to the ALJ's decision involve the manner and method by which the ALJ determined plaintiff's RFC. Specifically, plaintiff challenges the weight accorded by the ALJ to Dr. Clark's August 2012 opinion, the failure of the ALJ to include relevant mental limitations in the RFC, the ALJ's improper reliance on plaintiff's work history and role as a mother to find her able to work, and the lack of relevant medical evidence to support the RFC determination. The matter will be remanded for further proceedings for the reasons set out below, because it cannot be said that the ALJ's decision is supported by substantial evidence on the record as a whole.

### Plaintiff's Credibility

Residual functional capacity is the most a claimant can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records,

the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC assessment. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). As such, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell*, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Id.*

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating thereto, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir.

2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing the reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). An ALJ must do more than merely invoke *Polaski* to insure "safe passage for his or her decision through the course of appellate review." *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995). Instead, "the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski*[.]" *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998). It is not enough to merely state that inconsistencies are said to exist. *Cline*, 939 F.2d at 565. While an ALJ need not explicitly discuss each *Polaski* factor, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). If the ALJ's credibility determination is supported by good reasons and substantial evidence, the Court must defer to this determination. *Renstrom*, 680 F.3d at 1064.

Here, the ALJ cited various inconsistencies in the record to find plaintiff's credibility to be "severely undermine[d]." (Tr. 21.) Specifically, the ALJ noted that plaintiff's compliance with her treatment regimen was questionable, observing that plaintiff failed to appear for mental health services in late 2011 and early 2012

and had stopped taking her medication in early 2012. A claimant's non-compliance with prescribed treatment is a basis upon which to find her subjective complaints not credible. *Wildman,* 596 F.3d at 968-69; *Brown v. Barnhart*, 390 F.3d 535, 542 (8th Cir. 2004). To the extent plaintiff claims that the effects of her depression caused her failure to keep her appointments, the undersigned notes the ALJ to have acknowledged this possibility but to have observed that plaintiff kept her appointments regarding her physical health during this time, including participating in a sleep study and getting routine treatment for diabetes. (*See* Tr. 21.) As such, while an adverse determination may be flawed by an ALJ's failure to recognize that a claimant's non-compliance with treatment may be a manifestation of her mental impairment, *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009), the ALJ here acknowledged such circumstance and properly considered evidence of record that showed plaintiff's mental impairment not to interfere with her ability to keep and maintain appointments. The ALJ therefore did not err in considering plaintiff's non-compliance with treatment to find her claims not credible.

The ALJ also noted plaintiff to have given inconsistent reports regarding her substance abuse and continued use of marijuana and that, while being eligible for substance abuse treatment, she declined services. *See Gulliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow recommended course of treatment

weighs against claimant's credibility); *Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (inconsistency in claimant's statements valid reason to discredit subjective complaints). The ALJ also noted the record to show plaintiff's continued receipt of unemployment benefits during the period she claimed she was disabled. A claimant's application for unemployment benefits adversely affects her credibility inasmuch as an unemployment applicant must hold herself out as available, willing, and able to work. *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014).

The ALJ also looked to plaintiff's work record and found the evidence to show that plaintiff was able to work with her mental impairments prior to June 30, 2010, her alleged onset date of disability, and that the record showed no "worsening symptoms around that time." (Tr. 21.) Although it is reasonable to conclude that an impairment is not disabling where a claimant effectively works with her impairment over a period of time and there is no indication that her condition significantly deteriorated on or after the alleged onset date of disability, *see Goff,* 421 F.3d at 793, the record here shows that plaintiff's symptoms indeed worsened after the alleged onset date, *see* discussion *infra* at pp. 38-39, and no evidence shows that plaintiff worked or engaged in work-related activities with these worsening symptoms.

The ALJ also determined to discredit plaintiff's complaints because of her

ability to manage her own household and care for her daughter. To support his finding that plaintiff experienced only mild difficulty with such activities of daily living, the ALJ specifically recited plaintiff's ability to perform household chores – albeit without motivation – as well as her ability to help her daughter with grooming and hygiene and prepare meals for her. Although the ALJ acknowledged in other portions of his written decision that plaintiff claimed an onset of PTSD symptoms while bathing her daughter and that other family members actually care for her daughter three or four days a week because of plaintiff's claimed inability to do so, it appears that he failed to consider these adverse circumstances when determining that plaintiff's daily activities discredited her claims of disabling symptoms. Nor did the ALJ consider plaintiff's report to her healthcare providers that she obsessively performs chores during manic phases of her bipolar disorder and, further, that plaintiff's home appeared unclean and cluttered during her initial assessment for mental health services. When considered in context, therefore, plaintiff's daily activities as recited by the ALJ are not so inconsistent with plaintiff's claims of limited daily activities such that her credibility should be generally discounted. *See Cline,* 939 F.2d at 565-66 (ALJ must clarify the basis on which daily activities are inconsistent with allegations of pain; evaluation of extent to which claimant actually performed activities did not support adverse credibility determination). *See also Wagner*, 499 F.3d at 851 (ALJ

should consider quality of daily activities and ability to engage in such activities over a period of time).

Although the ALJ's evaluation of plaintiff's work record and daily activities was not the only component of his finding that plaintiff's subjective complaints were not consistent with the record evidence, the improper consideration of these factors weakens the ALJ's overall conclusion that plaintiff's credibility was "severely undermined" by the perceived inconsistencies in the record. *See generally Baumgarten v. Chater*, 75 F.3d 366 (8th Cir. 1996). The matter must therefore be remanded for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski.*

### Treating Source Opinion

Upon determining plaintiff not to be credible, the ALJ turned to Dr. Clark's August 2012 Mental MSS and determined to give it little weight in assessing plaintiff's RFC. (Tr. 21-22.) To support this determination, the ALJ noted that Dr. Clark had treated plaintiff on only one occasion, gave a poor explanation for his opinions, failed to acknowledge plaintiff's improvement with medication, and appeared to base his opinions on plaintiff's subjective complaints. Plaintiff claims that the opinion of this treating source was entitled to controlling weight.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating

sources, and non-examining sources.  *See* 20 C.F.R. §§ 404.1527(e)(2)(ii),

416.927(e)(2)(ii).  The Regulations require that more weight be given to the

opinions of treating physicians than other sources and, indeed, that a treating

physician's assessment of the nature and severity of a claimant's impairments

should be given controlling weight if the opinion is well supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2)*; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).

This is so because a treating physician has the best opportunity to observe and

evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion, including the length of the treatment relationship and the frequency of

examination, the nature and extent of the treatment relationship, whether the

treating physician provides support for his findings, whether other evidence in the

record is consistent with the treating physician's findings, and the treating

physician's area of specialty.  20 C.F.R. §§ 404.1527(c), 416.927(c).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Plaintiff contends that Dr. Clark's Mental MSS was entitled to controlling weight inasmuch as Dr. Clark was plaintiff's treating psychiatrist and because his opinions were consistent with all the other evidence of record.  The Regulations define a "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, *an ongoing treatment relationship with you.*"  20 C.F.R. §§ 404.1502, 416.902 (emphasis added).

The record contains no evidence that, at the time Dr. Clark rendered his opinion in August 2012, he had an ongoing treatment relationship with plaintiff – given that he had seen plaintiff on only one occasion in July 2012 – such that he had sufficient knowledge from which he could form an opinion regarding plaintiff's ability to function in the workplace.  *Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004).  Because the record does not support plaintiff's contention that Dr. Clark was a treating source as defined by the Regulations, the ALJ did not err in failing to accord controlling weight to his Mental MSS.

Furthermore, the ALJ cited other reasons for providing less than controlling

weight to Dr. Clark's opinions. Specifically, the ALJ noted Dr. Clark's lack of an ongoing treatment relationship with plaintiff and that Dr. Clark provided little support for his conclusions. These reasons are supported by substantial evidence on the record as a whole and constitute good reasons to discount medical opinion evidence. *See* C.F.R. §§ 404.1527(c)(2)(i), (c)(3); 416.927(c)(2)(i), (c)(3). The ALJ also noted that Dr. Clark failed to discuss the effects of plaintiff's substance abuse on her ability to function. Although an ALJ's determination of disability must first be made without segregating out any effects that might be due to substance use disorders, *see Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2011), the ALJ's perceived error here in faulting Dr. Clark's failure to address plaintiff's substance abuse was harmless at most given that Dr. Clark indeed addressed such abuse by stating that alcohol or substance abuse did not appear to contribute to any of plaintiff's limitations.

Plaintiff contends, however, that the ALJ should not have discounted Dr. Clark's opinion inasmuch as it was consistent with all the other evidence of record, and specifically, evidence that plaintiff's medications were continually adjusted and changed because of their ineffectiveness as well as evidence of plaintiff's consistent GAF scores below 50. Although Dr. Clark's opinions were consistent with some of the medical evidence of record, said medical evidence was limited and does not support that Dr. Clark's opinion should have been accorded greater

weight.  As discussed above, Dr. Clark was not a treating physician as defined by the Regulations and, as such, his opinions were not entitled to controlling weight.

Additionally, the ALJ cited other good reasons to discount the opinion evidence from Dr. Clark--his lack of an ongoing treatment relationship and the lack of support given for the opinions.  Nevertheless, given the limited medical evidence of record after the alleged onset date of disability of June 30, 2010 (*i.e.*, the records submitted only consist of roughly a half dozen treatment notes regarding plaintiff's mental impairments between October 6, 2011 and July 12, 2012) and the ALJ's conclusion that Dr. Clark's opinions should be accorded only little weight, the ALJ should have more fully developed the record.  The ALJ needed more evidence regarding how plaintiff's mental impairments affect her ability to work so that he could properly develop the plaintiff's RFC.  To accomplish this objective, the parties should have been afforded an opportunity to provide additional medical evidence.

### Plaintiff's Residual Functional Capacity (RFC)

In his written decision, the ALJ summarized the medical evidence of record in a very detailed fashion, however, failed to discuss or analyze how such evidence affected the RFC assessment.  Although it was not error for the ALJ to accord little weight to Dr. Clark's opinion, a review of the record *in toto* shows multiple mental health providers to have consistently observed plaintiff to exhibit serious

symptoms of mental illness or serious impairments in functioning. To the extent medical records show plaintiff to exhibit only moderate symptoms, a review of the record shows such occurrences to have been prior to plaintiff's alleged onset date of disability of June 30, 2010. Although the ALJ observed that plaintiff was able to work with her impairments prior to the alleged onset date and correctly stated that the record showed no worsening symptoms "around that time," the record also shows a significant worsening of symptoms thereafter. By March 2012, the plaintiff was voluntarily admitted to the hospital for suicidal ideation.

While the record shows plaintiff to have received no specific mental health treatment from a mental health provider until October 2011, there were continuous references by her physical health care providers that she was taking Prozac and Seroquel prior to October 2011, and specifically, in December 2010, January 2011, and May 2011. Plaintiff sought specific mental health treatment in October 2011 at which time she reported being out of medication for seven days and that she wanted to try different medication inasmuch as she was not as happy as before. She had a GAF score of 45 at the time, indicating serious symptoms.

Four weeks later, plaintiff continued to exhibit serious symptoms despite compliance with medication, as demonstrated by her GAF score of 48 as well as by Dr. Goldman's observations. She thereafter failed to keep appointments with her mental health providers and admittedly stopped taking her medication. As

previously noted, in March 2012, plaintiff appeared at a hospital with suicidal ideation and a plan. Her intake GAF score was 30, indicating an inability to function, but she had been without treatment for some time. After a four-day period of hospitalization, which included medication management and therapy, plaintiff was discharged with a GAF score of 50, which, while improved, nevertheless continued to indicate serious symptoms. Three weeks later, during a subsequent evaluation for continued outpatient treatment, plaintiff exhibited symptoms that Dr. Cafer considered to demonstrate major impairments in functioning, as demonstrated by the GAF score of 35. Significantly, these observations were made after plaintiff had been on a treatment regimen with psychotropic medication for at least three weeks.

Despite Dr. Cafer's prescription for additional medication as well as his adjustments to plaintiff's current medications, plaintiff continued to exhibit serious symptoms with worsening irritability and continued nightmares as recorded in the treatment notes. Although the ALJ states that plaintiff had shown some improvement as demonstrated by a GAF score of 42 in May 2012, it cannot be said that an improvement from major impairments in functioning (GAF 35) to serious symptoms and impairments in functioning (GAF 42) indicates an improvement so significant that it renders plaintiff's impairments amendable to medication – at least not to the degree that she is able to function in the workplace. Indeed, despite

continued therapy with psychotropic medication, including additional medications and increased dosages, plaintiff continued to report serious symptoms and impairments in functioning that were documented by a number of the treating sources.

The Commissioner argues that GAF scores alone are not determinative of the extent to which a claimant's mental impairment affects her RFC and that plaintiff's low GAF scores here bear no direct relation to the severity of her mental impairments. The Commissioner is correct in that the GAF scale has not been endorsed by the Social Security Administration for use in the Social Security and SSI disability programs and "does not have a direct correlation to the severity requirements in [the] mental disorders listings." 65 FR 50746-01, 50764, 2000 WL 1173632 (Soc. Sec. Admin. Aug. 21, 2000); *see also Halverson,* 600 F.3d at 930-31. The GAF scores, however, may still be used to assist the ALJ in assessing the level of a claimant's functioning. *Halverson*, 600 F.3d at 930-31. Here, while the ALJ acknowledged plaintiff's GAF scores, he did not discuss the significance of the consistently low scores nor give any reason why they should not be considered in assessing plaintiff's RFC. A "history of GAF scores at 50 or below, *taken as a whole*, indicate [that the claimant] has '[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . .'" *Pate-Fires,* 564 F.3d at 944 (quoting DSM-IV at 32) (emphasis added), and cases cited

therein.  The ALJ's failure to consider this consistent evidence of impaired

functioning in conjunction with the other evidence of record that demonstrated the

same was error.  *Id.* at 944-45.

Notably, the State agency consultant reported in March 2011 that there was

insufficient evidence from which the severity of plaintiff's mental impairments

could be determined.  This report was made seven months prior to plaintiff's first

documented treatment received from a mental health provider subsequent to the

alleged onset date of disability, and thus prior to all of the evidence of record

demonstrating the extent to which plaintiff's mental impairments affected her

functional abilities during the relevant period.  With the ALJ's determination to

accord little weight to Dr. Clark's opinion evidence, his lack of analysis regarding

the consistent medical evidence of record demonstrating plaintiff's serious

limitations caused by her mental impairments, and the absence of medical evidence

from any other source, it is not clear as to what medical evidence, if any, the ALJ

relied on to conclude that plaintiff was limited only with regard to fast-paced

production work and the degree of her interaction with the public.  Because the

ALJ's decision is unclear as to the medical basis for his assessment of the degree to

which plaintiff's impairments affect her RFC, the matter must be remanded to the

Commissioner for further proceedings.  *Lauer v. Apfel*, 245 F.3d 700, 704-05 (8th

Cir. 2001).  Drawing a conclusion regarding credibility is not equivalent to

demonstrating by medical evidence that a claimant has the RFC to perform certain work-related activities. *Estabrook v. Apfel*, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), *cited approvingly in Graham v. Colvin*, No. 4:12-cv-00863-SPM, 2013 WL 3820613, at *7 (E.D. Mo. July 23, 2013) (memorandum opinion).

This cause is therefore remanded to the Commissioner for further consideration. Upon remand, the ALJ shall further develop the record. The Commissioner shall obtain and provide the parties an opportunity to submit additional medical evidence that addresses plaintiff's ability to function in the workplace, which may include contacting her treating mental health sources to clarify her limitations and restrictions in order to ascertain what level of work, if any, she is able to perform. *See Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006). The ALJ is also permitted to order additional mental examinations and tests in order for him to make an informed decision as to disability. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. §§ 404.1517, 416.907. Upon receipt of any additional evidence, the ALJ shall reconsider the record as a whole, reevaluate the credibility of plaintiff's own description of her symptoms and limitations, and reassess plaintiff's RFC. Such reassessed RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion and description of how the evidence supports each RFC conclusion. *Cox v. Astrue,* 495 F.3d 614, 619 (8th

Cir. 2007).

Therefore, for the reasons stated above,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is

entered this same date.

Dated:  June 8, 2015

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE